IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO.   18-cr-00359-REB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

LAWRENCE MARTIN BIRK,

    Defendant.

---

**DEFENDANT'S SENTENCING STATEMENT
AND MOTION FOR NON-GUIDELINE SENTENCE OF PROBATION**

---

Comes now, Defendant (hereinafter "Mr. Birk" or "Lawrence Birk"), by and through undersigned counsel, and, submits his Sentencing Statement seeking a below guideline sentence of probation for the reasons set forth below:

## INTRODUCTION

The government's sentencing recommendation to an advisory guideline sentence of five-years in prison is greater than necessary under 18 USC 3553 and that probation would be sufficient to achieve sentencing goals. Although he appreciates Probation's recommendation of a significantly lower sentence to six-months of custody, he believes that a non-custodial sentence would be sufficient.

The appropriate sentence in this case is one which imposes no imprisonment. A sentence of probation best meets the sentencing imperative that the sentence imposed be "sufficient but no greater than necessary" to achieve 3553 goals.

This Court must, of course, consider the advisory guidelines, but here it should accord them little weight. To the extent that the sentence proposed represents a sentence below that recommended by the advisory sentencing guidelines, this Court should vary or depart downward from those guidelines. Both individualized analysis of the 3553 factors and a seriously flawed guideline warrant such a sentence.

## **FACTS:**

Mr. Birk's unorthodox tax beliefs led him in 1998 to stop paying income taxes. Before that, and throughout a long career in both the military and working for defense contractors in service of the United States, Mr. Birk had faithfully paid his taxes.

On July 25, 2019, a jury found Mr. Birk guilty of one count of tax evasion. An Army and Marine veteran, at age 65 and with no criminal history, Mr. Birk now faces both a potential prison sentence and an uncertain financial future.

The government seeks a five-year prison sentence and over three million dollars in tax loss. Mr. Birk failed to pay taxes from 1998-2018. This resulted in a tax liability (in unpaid taxes) of approximately $900,000.00.[1] Yet, Mr. Birk will likely owe the IRS somewhere between 1.6 million and 3.5 million dollars when interest and penalties are accounted for. His financial future is uncertain. So is his wife's future because he is her sole caretaker and she has advanced dementia.

---

[1] This tax liability estimate is based upon adding RA Trabold's Summary trial Ex. 130 total, the 2006-2011 SFR's, and RA Trabold's bank records analysis referenced in the Government's Sentencing Statement ($142,288).

2

## ARGUMENT

### 1.     The Guidelines are Flawed and Deserve Little Weight

Congress viewed probation as a distinct type of criminal punishment with independent value in the overall sentencing scheme, not a gift of "leniency" to be bestowed only in extraordinary cases.  Through the Sentencing Reform Act ("SRA"), Congress directed the Sentencing Commission to implement that view by designing guidelines that would insure that probationary sentences would be the "general(ly) appropriate" sentence in certain defined categories of cases. 28 U.S.C. § 994(j).  In the cases described in Section 994(j), then, a probationary sentence is presumptively appropriate.

The Commission, however, totally failed to comply with these congressional mandates. The Commission's misinterpretation of the statutes and the SRA's legislative history led it to incorrectly conclude that Congress in the SRA expressed a preference for more incarceration in all white-collar cases and that Congress generally disfavored probation, especially in all white-collar cases.  The commentary to the applicable guideline states that "[u]nder pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of  twelve months.  This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length." U.S.S.G. § 2T1.1, comment. (backg'd.).  But the increase in sentence ranges, requiring incarceration in most cases, contradicts Congress's direction that first offenders convicted of non-violent offenses are not appropriate candidates for imprisonment.  28 U.S.C. § 994(j).

3

As the Senate Report said:

> The placing on probation of ... a tax violator, may be perfectly appropriate ... [The] Committee [does not consider] a sentence of imprisonment to be the only form of sentence that may effectively carry deterrent or punitive weight. It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose.

S. Rep. 98-225, 92, 1984 U.S.C.C.A.N. 3182, 3274-75 (1983).

The Commission recognized the need to act on this directive, but has never done so. USSC, *Recidivism and the First Offender* 1-2 (May 2004) (hereinafter "First Offender"), http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf. Instead, the Commission designed a guidelines structure that overwhelmingly favored the imposition of prison sentences and provided no mechanism to guide sentencing courts in their consideration of probationary sentences. This failure to provide guidelines for the imposition of probation occurred even in cases involving first-time offenders and non-violent offenses, and even when supervision with conditions likely would produce sufficient punishment and deterrence. In these respects, the Commission did not "exercise . . . its characteristic institutional role" as envisioned by the SRA. *Kimbrough*, 128 S.Ct. at 575.

A consequence of this approach is that, contrary to Congressional intent, since the advent of the Guidelines there has been a drastic decrease in the use of probation sentences and increase in the length of imprisonment sentences. *See* Frank O. Bowman III, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis,* 105 Colum. L. Rev. 1315, 1350 (2005). The percentage of federal defendants sentenced to a purely probationary sentence declined from approximately 48% in 1984 to 6.2% in 2007. U.S. Sentencing Commission, 2 *The Federal Sentencing Guidelines:*

*A Report on the Operation of the Guidelines System and Short-Term Impacts on Disparity in Sentencing, Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining* 376 fig. 14 (1991); U.S. Sentencing Commission, *2007 Sourcebook to Federal Sentencing Statistics* 27 Fig. D. (2007), available at http://www.ussc.gov/ANNRPT/2007/Table 16.pdf.  Meanwhile, the length of prison sentences has nearly tripled.  Bowman, 105 Colum. L. Rev. 1315, 1328, 1350 n. 65.

The Commission has ignored feedback from judges, contrary to the SRA.  *See* 28 U.S.C. § 994(o).  As the fifteenth anniversary of the Guidelines' enactment approached, the Commission conducted a survey of federal circuit and district court judges.  *See* U.S. Sentencing Commission, *Summary Report: U.S. Sentencing Commission's Survey of Article III Judges* (Dec. 2002).  The judges were asked, among other things, to "identify where you believe that changes in the availability of guideline *sentence types* would better promote the purposes of sentencing."  *See id.*, App. B-7 (emphasis in original).  Of the responding district court judges, 38.2% said they believed that straight probationary sentences and 46.1% said probation with confinement conditions should be "more available" in fraud cases. *Id.*

The Guidelines' incorrect treatment of probation also flows from the Commission's flawed use of empirical data in its original analysis of past sentencing practices: in estimating "average" sentences under past practice, the Commission examined only cases that resulted in imprisonment, thus disregarding roughly 48% of all sentences imposed during the relevant time period. Because the Commission excluded probation sentences from its "empirical research," its base line data was incorrect, resulting in Guidelines artificially biased toward harsher sentences -- especially in white

5

collar and tax cases, such as this one.  The Guidelines unduly emphasize imprisonment, and probation has been used far less frequently than anticipated by Congress.

The development of the tax guidelines in particular, Chapter 2T, demonstrates how the Commission's selective use of data resulted in ranges that diverged dramatically from past practice.  Table 1(a) of the Supplementary Report compiles average past sentences for first-time offenders convicted at trial of various offenses.  The Supplementary Report explains that the "'sentence level' is the offense level that is closest to the average time currently served by first-time offenders *who are sentenced to a term of imprisonment.*"  *Supplementary Report* 23 (emphasis added).  Thus an average pre-Guidelines sentence of approximately 18 months would translate to a sentence level of 14 (15-21 months).  *Id.*

The comparison is misleading, however, because the pre-Guidelines "averages" were based only on cases involving terms of imprisonment.  The tax guideline is skewed. Only 30% of first-time offenders convicted after trial in tax cases involving loss of $5,000 or less were sentenced to prison.  The Commission's estimate of "average" time served – equivalent to a level 9 (4-10 months), a range with a midpoint of 7 months – was based only on this subset of 30% of offenders.  *Supplementary Report*, Table 1(a) at 34.  Inclusion of the vast majority of such offenders who did not receive sentences of incarceration would have reduced the average sentence length to a little over two months.

Ultimately, because the tax guideline rests on a flawed selection of "empirical data and national experience," it "does not exemplify the Commission's exercise of its

6

characteristic institutional role." Accordingly, it is not an abuse of discretion for a district court to conclude that the tax guideline inappropriately yields a sentence that is greater than necessary.

### 2. Individualized 3553 Analysis Also Supports a Sentence Which Imposes No Further Imprisonment

As set forth above, the advisory guidelines' lack of consideration of non-prison sentences creates a guideline sentence here, which is more than necessary to achieve justice. This is important because of Congress' directive that this Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." 18 U.S.C. § 3553(a) (emphasis added). These purposes include, *inter alia,* the need to reflect the seriousness of the offense and promote respect for the law, to afford adequate deterrence, to protect the public from further crimes, and to provide the defendant with needed educational or vocational treatment. *See* 18 U.S.C. § 3553(a)(2).

In this case, a probation sentence achieves these goals. Mr. Birk's personal history and characteristics support such a sentence. Nor would this promote disrespect for the law. To the contrary, it would provide appropriate individualized rehabilitative resources to Mr. Birk and would be a sentence sufficient but not greater than necessary to achieve the goals of 18 U.S.C. § 3553(a).

### A. Mr. Birk's Personal History and Characteristics.

Lacking any criminal record, Lawrence Martin Birk stands before this Court as a sixty-five year-old man who until this case, led an exemplary life. He served the United States in the military and later for many years in the defense industry. He has raised a loving family, worked hard and contributed positively to his community. The tax issues

for which he now faces sentencing, by all accounts, are atypical conduct for this otherwise honest and law-abiding man.

The measure of Mr. Birk is best expressed in the many strong and supportive letters attached to this pleading. Typical of those letters are these observations by those who know him best:

Deanna Daniel, Secretary/Worship Leader for Home Church of the Rockies, has known Mr. Birk for twenty years. She speaks glowingly of his good character:

> If I had to choose someone in our church to take care of my two grandsons whom I love more than life, were something to happen to my husband and I and our daughter, it would be Marty. I know they would be taught manners, respect, responsibility, a love for God, a love for country; all in a peaceful, happy, loving, caring manner…
>
> ***         ***         ***
>
> Marty's mission in life is helping out his fellow Americans wherever they may be….

*See* Daniel Letter (Exhibit A).

Ms. Daniels adds that:

> During a time when boys were running to Canada to avoid the draft, Marty ran to enlist; not once but twice; in the United States Army and the United States Marine Corps Reserve. From this we see that Marty loves America and was willing to die for Her….
>
> He is an arrow in the quiver of what is true and right for our community, our church, our country and those who are willing to take the time to find answers….

*Id.*

These sentiments are echoed by others like Donald and Beverly Hindman who advise the Court that "Marty … [is] an honest, caring, hardworking, spiritual man, and a friend. I wish I knew more men like him…." *See* Hindman Letter (Exhibit B).

Likewise, David Daniel attests:

> Marty has always been a Great, Loving and Caring man in my eyes because of his dedication and sacrifice into everything he has done through the years for the church, for his brothers and sisters in Christ and to ultimately glorify God….

*See* Daniel Letter (Exhibit C).

Indeed, the universal sentiment of those who know Mr. Birk well is that he is one of the kindest and most giving person they know. Diana Williams, who has known Marty Birk for 18 years, shares this sentiment in her August 22, 2019 letter, noting that:

> he is a person that is caring loving does a lot for the community. Always helping with giving… Marty is a person that will pull you out of the muck if that's what need be. He's just a great person that you can trust and love…

Other people who have known Mr. Birk for years observe that:

> We look up to Marty for his example of what it means to serve God and be a loving, devoted husband.

-- Howard and Barb Stone. *See* Stone Letter (Exhibit D).

> Through the years of knowing Marty, he has been honest, hardworking and down to earth. Marty has always been dependable and when he gives his word, he follows through. Marty is a family man…
>
> \*\*\*         \*\*\*         \*\*\*
>
> Marty is an honorable, a very good and decent person who is a true citizen to the community.

-- Carol N. Congdon. *See* Congdon Letter (Exhibit E).

Mr. Birk's pastor, Dr. Lynnwood M. Baade, sums it up well:

> I have known Mr. Marty Birk for more than 8 years….We currently attend the same church, where I serve as a Pastor. I have found him to be dependable, honest, and hard working. He has shown himself to be honest, charactered, and trustworthy in all endeavors….

*See* Baade Letter (Exhibit F).

Perhaps no better example of the kind of man Mr. Birk is can be found in how he has dealt with his wife's tragic Alzheimer's diagnosis. He has steadfastly stood by her. Moreover, he has handled the situation with grace and compassion. As good friend Robert J. Robinson writes:

> It was very hard to see Marty's lovely wife stricken with Alzheimer's Disease in these past years. Regardless, Marty met that task with remarkable compassion and still remains able to continue as a productive member of our local community…

*See* Robinson Letter (Exhibit G).

Beyond his friends and members of his church community, Mr. Birk finds further support in his family. His brother, David Birk, states:

> Marty is my older brother of 10 years. I have always looked up to him as a role model and owe much of my success in life as a businessman and more importantly as a husband and father to our lifelong close relationship….
> What I have always seen in Marty is a selfless devoted man who cares more for those around him then himself. I have and will continue to always love him.

*See* David Birk Letter (Exhibit H).

Mr. Birk's brother-in-law, Kent Nowak in his August 29, 2019 letter agrees, noting that "[h]e is selfless and thinks of other before considering his own needs…" *See* Nowak Letter (Exhibit I).

Prison poses a hardship to anyone. Families are always affected. Here, however, the impact would be extraordinary and profound. It would pose a great and undue hardship for Mr. Birk and, especially for his wife, Jean. Mrs. Birk suffers medical issues that are well-documented in the presentence report. A prison sentence would leave her alone and with nobody to care for her. Mr. Birk's selflessness in this matter and the effect on his wife were he to be imprisoned is well summarized by Mr. Nowak:

> Watching him take care of his wife is both heartening and calming to all of us. My sister is dependent on Marty. He never gets upset or angry; just deals with challenge. His patience is commendable and if he were not around to take care of Jean, the family would be devastated…

*Id.*

Again, Mr. Birk's brother, David, explains further:

> I have literally come to tears watching him deal with the tragedy of his wife losing her mind and senses and the constant 24 hour support he provides her so that she can eat, go to the bathroom, get dressed and just make it through the day and the night. She is 100% reliant on him. He does it all with passion, tenderness and love that puts a smile on her (and his) face though they both are extremely frightened with what is happening to her. I doubt if I (or anyone) could match his devotion presented with similar circumstances.

*See* D. Birk Letter (Exhibit H).

### B. Nature and Circumstances of Offense.

This is a tax case. It is a non-violent offense. It is the result of Mr. Birk succumbing to the seductive but false beliefs of the tax protestor movement.

Simply put, Mr. Birk fell prey to the federal tax protestor mindset. Although he should have known better, Mr. Birk persisted in putting forth anti-tax views, even after the IRS contacted him. Significantly, however, he is not a hardened anti-government type. He never subscribed to a no government philosophy, often seen in cases like this.

Despite an actual amount of unpaid taxes of $900,000.00, Mr. Birk will likely owe the IRS somewhere between 1.6 million and 3.5 million dollars when interest and penalties are accounted for. His financial future is uncertain.

### C. Deterrence

A prison sentence is unnecessary either to deter Mr. Birk or others. Given his good character generally and the fact that this conduct was atypical, the felony conviction alone is sufficient deterrent to further misconduct by Mr. Birk.

Mr. Birk is chastened by this experience. He will not risk separation from his family and incarceration by reoffending. And, statistics suggest that he is highly unlikely to recidivate. Both the age of an offender and his criminal history status are powerful predictors of the likelihood of recidivism. Indeed, the Sentencing Commission has itself recognized that (1) recidivism rates decline dramatically with age, and (2) first-time offenders are even less likely to reoffend than defendants with a limited criminal history who also fall within Criminal History Category I. *See* U.S. Sentencing Commission, <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines</u>, at Ex. 9 (May 2004) [hereinafter *Measuring Recidivism Report*]; U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 13- 14 (May 2004) [hereinafter *First Offender Report*]. The Commission's research has, for example, demonstrated that a 20-year-old defendant in Criminal History Category I has a 29.5% chance of reoffending, while a 44-year-old defendant with the same criminal history has only a 6.9% chance of recidivating. *Measuring Recidivism Report* at Ex. 9. A 69-year-old's recidivism rate is lower still.

With respect to first offenders, the Commission has found that offenders with zero criminal history points have a recidivism rate of just 11.7%, while offenders with just one criminal history point have double the recidivism rate at 22.6%. <u>First Offender Report</u> at 13-14. Because the guidelines themselves fail to adequately consider

12

recidivism statistics, a growing number of courts have themselves taken both age and first-offender status into account when fashioning an appropriate sentence under 18 U.S.C. § 3553(a).  *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding sentence in child pornography case as reasonable where district court granted downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 2009 WL 995576, at *3 (2d Cir. Apr. 19, 2009) (holding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guidelines sentence where the district court's only reason for the variance was that the defendant's age made it unlikely that he would again be involved in another violent crime); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants, like Cabrera, "with zero criminal history points are less likely to recidivate than all other offenders); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (explaining that sentence of 262 months – as opposed to Guidelines sentence of 324 to 405 months – constituted "sufficient, but not excessive, deterrence" for 44-year-old defendant); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (explaining that age of offender is relevant to § 3553(a) analysis, even if not ordinarily relevant under the Guidelines, and granting variance to 57-year-old defendant); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first – *i.e.*, the charged – act).

Nor is general deterrence a significant concern in this unique case. Even if others might in theory be inclined to take away the message from a non-custodial sentence that they could evade taxes with impunity, the Court could make clear in its sentencing order (a public record) that it does not condone Mr. Birk's conduct. The Court could make clear that Mr. Birk's situation and the 3553 factors drive a probation sentence and that such a sentence is not always to be imposed in tax evasion cases.

### D. Seriousness of the Offense and Respect for the Law

A no jail sentence also adequately reflects the seriousness of the offense and promotes respect for the law. Such a sentence coupled with the felony conviction itself acknowledges that tax evasion is a serious offense. Yet, it also sends a message that the courts consider the individualized circumstances of cases as they are presented.

Indeed, the Supreme Court has admonished sentencing courts to "consider every convicted person as an individual," remaining mindful that a sentence of imprisonment "may work to promote not respect, but derision, of the law, if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 128 S.Ct. at 598-99 (citations omitted). Congress anticipated this approach in the SRA, where it expressed an expectation that imprisonment would be inappropriate and that probation would meet the requirements of 18 U.S.C. § 3553(a)(2) for certain offenders. See 28 U.S.C. § 994(j) charges the Commission with "insur[ing] that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense[.]"

### E. Protecting the Public

Finally, prison is not needed to afford protection to the public. This is a non-violent offense. Mr. Birk's history suggests that protection of the public by incarcerating him simply is not needed. The public is far better served here by a probation sentence, than by wasting further tax dollars needlessly incarcerating him.

### 3. USSG 5H1.6 Also Supports a Sentence Which Imposes No Further Imprisonment

Probation has justified a downward departure pursuant to USSG 5H1.6 (Family Ties and Responsibilities). Mr. Birk agrees and submits that a departure under this guideline is warranted given Mr. Birk's caretaker role for his wife.

"In sentencing a defendant… family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." USSG § 5H1.6 <u>Family Ties and Responsibilities</u> (Policy Statement). However, in "determining whether a departure is warranted under this policy statement, the court shall consider the following non-exhaustive list of circumstances:

(i) The seriousness of the offense.

(ii) The involvement in the offense, if any, of members of the defendant's family.

(iii) The danger, if any, to members of the defendant's family as a result of the offense.

*Id* at Application Note 1.

Here, the offense is not of a nature so serious as to preclude a departure. Mr. Birk's family (his wife Jean) was not involved in the offense. And, the offense posed no danger to the family.

A departure under 5H1.6 based on the loss of caretaking also requires the presence of the following circumstances:

> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
>
> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.
>
> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

*Id.* Each of these factors is present here.

First, Mr. Birk's service of a sentence within the applicable guideline range (51-63 months) will cause a "substantial, direct, and specific loss of essential caretaking, or essential financial support" to his wife. He is her sole caretaker and financial support. Nobody else in the family is present or able to care for her. She cannot be left alone due to her mental and physical state. And, Mr. Birk lacks the resources to engage full time nursing care.

Second, Mr. Birk's loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. This is not just a case of going to jail and the family losing the breadwinner. Mrs. Birk is unable to work. Nobody else is available to care for her. It is an extraordinary situation.

Third, the loss of Mr. Birk's caretaking and financial support is one for which Mrs. Birk has no effective remedial or ameliorative programs reasonably available. As such, his caretaking and financial support are irreplaceable.

16

Fourth, the departure effectively will address the loss of caretaking or financial support. Leaving Mr. Birk out of custody allows him to remain as Mrs. Birk's caretaker.

Case law supports the departure where, as here, "the defendant was the only individual able to provide the assistance a **family** member needs." *United States v. McClatchey*, 316 F.3d 1122, 1131 (10th Cir. 2003). *See also United States v. Gauvin*, 173 F.3d 798, 808 (10th Cir. 1999). Indeed, examples abound of courts upholding upheld such departures in virtually every circuit. *See, e.g.,* United States v. Roselli, 366 F.3d 58, 70 (1st Cir.2004) (three level downward departure upheld when defendant had two children with cystic fibrosis and wife had serious debilitating health problems); United States v. Johnson, 964 F.2d 124, 129 (2d Cir.1992) (where defendant was solely responsible for her three young children, including infant, as well as young child of institutionalized daughter, number, age and circumstances of these children justify departure); United States v. Alba, 933 F.2d 1117, 1122 (2d Cir.1991) (upholding departure where defendant and wife cared for four and eleven year old daughters and defendant's disabled father and paternal grandmother; court concluded that this was "close-knit family whose stability depends on [defendant's] continued presence"); United States v. Husein, 478 F.3d 318, 329 (6th Cir. 2007) (upholding departure where defendant's family situation required her to provide half of her family's financial support and care for her ill father while not working, which established her irreplaceability); United States v. Menyweather, 447 F.3d 625 (9th Cir.2006) (departure upheld where defendant was sole caregiver for daughter and an unusual relationship existed due to murder of daughter's father while mother was pregnant with daughter); United States v.

Leon, 341 F.3d 928, 932 (9th Cir.2003) (departure justified when defendant is sole person available to care for wife with cancer and suicidal ideation).

Among the cases most closely analogous to Mr. Birk's is *United States v. Gaskill*, 991 F.2d 82, 85–86 (3d Cir.1993), where the Third Circuit sustained the sentencing judge's decision to depart to a sentence of probation for a defendant who was solely responsible for the care of his mentally ill spouse.

Similarly, the Eighth Circuit has upheld a downward departure for a defendant who was an "irreplaceable" part of the treatment plan for his wife, who had potentially life-threatening psychiatric problems. *United States v. Haversat*, 22 F.3d 790, 796–97 (8th Cir.1994).   The Third and Eighth Circuits' concept of "irreplaceableness" has proven persuasive in the analysis of other circuits, including the Tenth Circuit.  *See United States v. McClatchey*, 316 F.3d 1122, 1133 (10th Cir.2003).

## **CONCLUSION**

A prison sentence is unwarranted and unreasonable.  Both the guidelines (5H1.6) and 18 USC 3553 support a noncustodial sentence.  A sentence of probation best meets the sentencing imperative that the sentence imposed be "sufficient but no greater than necessary" to achieve 3553 goals.

WHEREFORE this Court should reject a guideline sentence in favor of a non-custodial sentence.

        Respectfully submitted,

        VIRGINIA L. GRADY
        Federal Public Defender


        <u>s/ Edward R. Harris</u>
        Edward R. Harris
        Assistant Federal Public Defender
        633 17th Street, Suite 1000
        Denver, CO  80202
        Telephone:  (303) 294-7002
        FAX:  (303) 294-1192
        Edward_Harris@fd.org
        Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Christopher Michael Magnani, Assistant United States Attorney
E-mail:  christopher.magnani@usdoj.gov

Elizabeth Caryl Hadden, Assistant United States Attorney
Email:  elizabeth.c.hadden@usdoj.gov

    s/ Edward R. Harris
    Edward R. Harris
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, CO  80202
    Telephone:  (303) 294-7002
    FAX:  (303) 294-1192
    Edward_Harris@fd.org
    Attorney for Defendant