**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Criminal Case No. 18-CR-00359-REB

UNITED STATES OF AMERICA,

         Plaintiff,

v.

LAWRENCE MARTIN BIRK,

         Defendant.

---

**UNITED STATES' SENTENCING RECOMMENDATION AND
RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT
GUIDELINES CALCULATIONS AND MOTION FOR NON-GUIDELINE SENTENCE**

---

The United States of America opposes Defendant's Objections to Presentence Report Guideline Calculations [#102] ("Defendant's Objection") and Motion for Non-Guideline Sentence of Probation [#103][1] ("Defendant's Motion") and recommends a sentence of 60 months of imprisonment. What Defendant describes as his "unorthodox tax beliefs" is just greed masked by the canned "good faith" defense employed by tax defiers throughout the country. The proposed enhancements for sophisticated means and obstruction of justice are appropriate, and any mitigating factors presented by Defendant are not atypical of similarly situated defendants. Defendant's affiliation with

---

[1] N.b., Defendant also made sentencing arguments in his Reply to United States' Sentencing Statement [#99]. The United States' Sentencing Statement is at [#95].

"We The People" and the "Tax Honesty Movement" make deterrence especially important in this case.  Just as Defendant testified that he studied the criminal cases of other tax defiers, focusing mostly on "the acquittals," Tr. Trans. 7/24/19 ("Transcript")[2] at 124:10, other tax defiers will be following this case.  The Court's sentence must not only be sufficient to cause regret—the sense that the crime was not "worth it"—for the Defendant who was caught, but to deter others who might otherwise think that certain financial windfall today is worth the low risk of being convicted twenty years later.  A five-year sentence, which is the maximum allowed by statute but well-below the Guidelines range, will make it clear that only harsh punishment awaits the unlucky tax cheat who is audited, assessed, pursued by IRS Collections, referred for criminal investigations after evading collection, indicted, tried, and found guilty after mounting a false willfulness defense and failing to convince a single juror that he truly misunderstood his tax obligations.

---

[2] This is the only transcript cited in this filing.  It was attached as Exhibit A to the United States' Sentencing Statement [#95].

# TABLE OF CONTENTS

I.  GUIDELINES CALCULATION ............................................................................ 1

   A.  Sophisticated Means ........................................................................... 1

   B.  Obstruction of Justice ......................................................................... 3

   C.  Family Ties and Responsibilities ......................................................... 7

II.  OTHER SENTENCING FACTORS .................................................................. 14

   A.  The Nature and Circumstances of the Offense ............................... 15

   B.  The History and Characteristics of the Defendant ......................... 17

      I.  *History* ........................................................................................... 17
      II.  *Character* ..................................................................................... 18

   C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment ...... 22

   D.  The Need for the Sentence Imposed to Afford Adequate Deterrence ......... 23

      I.  *Specific deterrence* ...................................................................... 23
      II.  *General deterrence* ...................................................................... 24

   E.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct .... 27

III.  DEFENDANT'S POLICY ARGUMENTS SHOULD BE AFFORDED NO WEIGHT ...................... 28

IV.  RESTITUTION ........................................................................................ 29

V.  COSTS OF PROSECUTION ....................................................................... 30

VI.  CONCLUSION ....................................................................................... 31

## I.   GUIDELINES CALCULATION

Defendant's Objection does not contest the tax loss calculation, but objects to Probation's application of enhancements for sophisticated means and obstruction of justice.  Without these enhancements, the Guidelines range would be 51-63 months of imprisonment.  With just one of these enhancements, it would be 63-78 months of imprisonment.  The enhancements are appropriate for the reasons stated in the United States' Sentencing Statement [#95] and incorporated into the PSR, as well as for the reasons below, which are responsive to Defendant's Objection.

### A.  Sophisticated Means

Defendant does not dispute the facts that support this enhancement and cites no cases in support of his position, arguing only that the case cited in the United States' Sentencing Statement, *United States v. Vernon*, 814 F.3d 1091, 1107 (10th Cir. 2016), does not require the application of this enhancement.  Defendant also claims his review of other (uncited) case law suggests the enhancement is appropriate only when multiple shells are used "or there must be more complicated use of a single corporation than occurred here."  Defendant's Objection at 3.  Yet, the Tenth Circuit has affirmed the application of this enhancement in cases with schemes far less sophisticated than the TAMI fraud, which is outlined in PSR ¶¶ 9-12.  In addition to *Vernon*, which was on appeal from the District of Kansas, the Court should consider *United States v. Stubbs*, 764 F. App'x 682, 691 (10th Cir. 2019), which resulted from a more analogous tax

defier[3] case tried in Denver before Judge Arguello.  In *Stubbs*, the Court applied the

enhancement because, like Defendant, Stubbs paid personal expenses out of his

business account.  The only other factors leading to the enhancement in *Stubbs* were

his refusal to give his company's employer identification number (EIN) to a customer

(presumably to prevent the customer from reporting its payments to the IRS) and his

false representation to customers (seemingly designed to facilitate sales, rather than

further tax evasion).  *Id.* at 691.  Defendant's TAMI fraud was far more sophisticated

than Stubbs's.  Where Stubbs prevented his customer from reporting his income to the

IRS by simply refusing to disclose his EIN, Defendant evaded both third-party reporting

*and withholding* by creating a shell entity to deceive the financial institutions (including

the Janus and Oppenheimer funds) that served as custodians to his and his wife's

retirement accounts.

An enhancement for sophisticated means "does not require a brilliant scheme,

just one that displays a greater level of planning or concealment than the usual tax

evasion case."  *Id.* (quoting *United States v. O'Doherty*, 643 F.3d 209, 220 (7th Cir.

2011).  This is not a case where the defendant simply underreported income or

---

[3] "Stubbs represented himself at trial.  He did not contest that he failed to file tax returns and pay income tax for 2005, 2006, and 2007.  Instead, he raised a good-faith defense. He testified that in 1993, it was brought to his attention that the Fourteenth Amendment was not properly ratified…" *Id.* at 684.  Stubbs received an 88-month sentence.

overreported deductible expenses.[4]  Defendant's conduct, especially the TAMI fraud, was sufficiently sophisticated to merit the two-level enhancement.

### B.  Obstruction of Justice

The jury rejected Defendant's contrived willfulness defense and found, beyond a reasonable doubt and notwithstanding his testimony to the contrary, that Defendant did not have a good faith misunderstanding of the law.  On this record, the Court should find, by a preponderance of evidence, that Defendant committed perjury when he testified that his objections to the tax law were not constitutionally based (the "not constitutional" testimony) and when he told the jury that he did not create TAMI for the purpose of hiding income from the IRS and, in fact, did not hide anything from his return preparers (the "TAMI" testimony).  *See* PSR ¶¶ 17-21.

Defendant's Objection claims he did not commit perjury when testifying, but does not address whether he committed perjury in his CJA 23 financial affidavit.  Defendant argues that the "not constitutional" and "TAMI" portions of his testimony cannot be perjury because they were not false.  He does not argue that they were not material, or that his statements were made by mistake or accident.  In fact, Defendant concedes that he "unequivocally testified" that he believes the tax law is constitutional. Defendant's Objection at 4.  He maintains he did not commit perjury because "[h]e is not

---

[4] The government is aware of only one Tenth Circuit case reversing the application of the enhancement.  *See United States v. Rice*, 52 F.3d 843, 849 (10th Cir. 1995) ("[Defendant merely claimed to have paid withholding taxes he did not pay.  Although the trial court's finding is entitled to deference, we are hard pressed to agree with its conclusion.  In substance, [defendant's] fraud is the functional equivalent of claiming more in itemized deductions than actually paid.").

a lawyer" and has "an ignorance of law that belies the government's view that he was a clever schemer." *Id.*

Unlike the parties' dispute regarding the sophisticated means enhancement, this is a factual, rather than a legal dispute. The Court must make factual findings, independent of the jury's verdict, as to whether Defendant lied about a material matter. *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). "[I]t is preferable for a district court to address each element of the alleged perjury in a separate and clear finding." *Id.* The Court's "finding must encompass all of the factual predicates of perjury" and "specifically identify the perjured testimony." *United States v. Quarrell*, 310 F.3d 664, 681 (10th Cir. 2002). To support the enhancement, the Court must find 1) Defendant gave false testimony, 2) concerning a material matter, and 3) with willful[5] intent. *Id.* at 682.

In *United States v. Rodebaugh*, the Tenth Circuit affirmed Judge Arguello's obstruction of justice findings on the basis of perjury. 798 F.3d 1281 (10th Cir. 2015). Rodebaugh ran an outfitting and guide service that took clients on hunts, and he was convicted of spreading salt at the base of his tree stands to attract game in violation of Colorado state regulations. *Id.* at 1287. Judge Arguello found that Rodebaugh perjured himself when he claimed that a) he only baited in the spring, b) he thought baiting was legal as long as the salt was gone by the time the hunters arrived, and c) he did not own the tree stands at issue. *Id.* at 1301. In affirming the sentence (the 72-year-old

---

[5] Unlike in criminal tax cases, "willful intent" in the context of perjury requires only proof that the defendant *intended* to provide false testimony, "rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94-95.

received 41 months' imprisonment), the Court of Appeals found Rodebaugh's testimony "material" because it was offered in an "effort to support his defense that baiting with salt is legal as long as the salt is gone by the time the hunters arrive." *Id.* at 1301.

Defendant's "not constitutional" testimony, e.g. "I believe the tax code is absolutely constitutional," Transcript at 56:7, was similarly material because it was offered in support of his defense. As the jury was instructed, [#93] Instruction No. 9, the "good faith misunderstanding" defense cannot be predicated on a belief (even an earnestly held belief) that the law is unconstitutional. This posed a problem for Defendant, who was on record making numerous constitutional challenges, including that the 16th Amendment was not properly ratified. Rather than backtrack, Defendant doubled down at trial, testifying to the same constitutional objections, but maintaining they were *not* constitutional. *See* PSR ¶¶ 18-19. Defendant's present claim that he is too legally unsophisticated to lie about this is belied by his testimony that he studied criminal tax jury instructions, understood that his subjective understanding was at issue in the trial, and knew that believing the law was unconstitutional was not a defense. Transcript at 124:19-125:8.

Defendant's "TAMI" testimony[6] was not as explicitly tied to his defense but was still material. Deceiving a return preparer is classic consciousness of guilt evidence in criminal tax trials. Here, Defendant sought to deprive the government of that willfulness

---

[6] E.g., "Q: Did you ever hide anything from [your return preparers]? A: I did not," Transcript at 75:5-6; "Q: . . . was it your intention that Tarryall Asset Management be used . . . to hide income from the IRS? A: That was not my intent." *Id.* at 75:17-24.

evidence while also bolstering his credibility, which was also material in this case.  As a witness in his trial—a witness he needed the jury to believe—Defendant would have ruined his credibility with the jury if he admitted to misleading his return preparer.  The same is true of his claim that he did not create TAMI with the intent to hide income from the IRS.  His explanation that he created it "as a conduit to move my funds" is so contrived as to not even make sense.  Defendant's Objection does not even attempt to try to explain why he needed TAMI to move his funds.  Unable to explain, both now and during trial, any non-tax evasion reason for the creation of TAMI, the Court should find that Defendant created it, contrary to his testimony on direct, to hide income from the IRS.  In fact, on cross, he ultimately explained why he created it—not to move funds, but "to avoid paying withholding on a tax [he] didn't believe in."  Transcript at 102:5-7.  It should go without saying that the way he avoided this tax was by misleading his return preparers (and retirement custodians) and, ultimately, hiding this income from the IRS.

More broadly, and besides the specific instances of testimony described above and in the PSR, the obstruction enhancement is appropriate simply on the basis that Defendant offered false "good faith" testimony.  His testimony came straight out of the standard tax defier playbook, and Courts regularly apply the enhancement when a Defendant fails to convince the jury of his supposedly well-studied belief that the tax laws do not apply to him.  *See, e.g.*, *United States v. O'Donnell*, 111 F. App'x 60, 62 (2d Cir. 2004).  O'Donnell testified "that he did not believe he was required to file tax returns or pay income tax and had come to this conclusion based on years of researching the tax code."  *See* Brief for the United States of America at 47, *United States of America v. O'Donnell*, 111 F. App'x 60 (2d Cir. 2004) (No. 03-1361-cr), 2004 WL 5469291, at *47.

Based on that testimony, he argued "that he could not be convicted . . . because he believed in good faith that he was not required to . . . file tax returns or pay taxes." *Id.* The court found that, in finding him guilty of tax evasion, "it is evident that the jury rejected Mr. O'Donnell's claim which permeated his testimony that he in good faith believed he was not required to file tax returns and pay taxes." *Id.* at 48.  In applying the enhancement, the court noted that, "[i]n concluding that the evidence established that he acted willfully, the jury concluded that the Government proved beyond a reasonable doubt that O'Donnell's testimony regarding his research about the tax laws and the conclusions that he drew therefrom was false." *Id.* at 49-50.

Like O'Donnell, Defendant's "good faith defense" was premised on his supposed well-studied belief that he was not required to pay taxes.  If the jury thought there was even a reasonable probability Defendant's testimony to this effect might be genuine, he would have been acquitted.  By finding Defendant guilty, the jury necessarily concluded that he perjured himself when he stated that he did not believe the law required him to pay taxes.  Unless the Court draws a contrary conclusion, it should find that he perjured himself when he took to the stand.  It is more likely than not that Defendant knew that the testimony discussed above (and recounted in PSR ¶¶ 17-21) was not true when he offered it.  He does not argue it was not material, but the Court should make specific findings for each perjury element and identify the testimony for which its findings relate.

### C.  Family Ties and Responsibilities

Probation and Defendant both recommend a departure pursuant to USSG § 5H1.6 because Defendant's wife ("Mrs. Birk") has a major neurocognitive disorder.  In moving for a departure, the Defendant bears the burden of proving sufficient facts to

support it.  *United States v. Constantine*, 263 F.3d 1122, 1128 (10th Cir. 2001).  He has failed to do so, and the Court should not grant the departure.  For the same reason, the Court should also not vary on these grounds.

The government does not challenge the characterization of Mrs. Birk's condition.  By all accounts, she is suffering through the late stages of a cruel disease.  But these circumstances are not so extraordinary as to be relevant at sentencing.  "[F]amily ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."  USSG § 5H1.6.  Defendant seeks a departure because his incarceration would create a loss of caretaking for Mrs. Birk.  *See* Defendant's Motion at 15-18.  But such a departure "*requires* . . . the presence of the following" four factors.  Application Note 1(B) (emphasis added).[7]  Although Defendant carries the burden of proving that all four factors are met, Defendant's Motion addresses them in a half-page of conclusory boilerplate.  Defendant is in a unique position to offer the Court detailed insight on this topic, and he has failed to do so, leaving the United States to conduct a limited investigation.

---

[7] The applicable note was amended by Congress in the 2003 PROTECT Act, which was passed to "further restrict family ties departures by adding an application note that establishes heightened criteria for departures based on loss of caretaking of financial support.  In such cases, *the court must find all of the following four circumstances*."  USSG Amendment 651, https://www.ussc.gov/guidelines/amendment/651 (last accessed on October 16, 2019) (emphasis added).  The Sentencing Commission agreed with Congress, deeming "these heightened criteria [] appropriate and necessary in order to distinguish hardship or suffering that is ordinarily incident to incarceration from that which is exceptional."  *Id.*  In short, both the Congress and Commission hold the view that departures due to the loss of caretaking should be limited and rare.

> (i)      *"The defendant's service of a sentence within the applicable*
> *guideline range will cause a substantial, direct, and specific loss of*
> *essential caretaking, or essential financial support, to the*
> *defendant's family."*

Mrs. Birk can no longer live her life independently and must be cared for.

Defendant's incarceration will cause a substantial, direct, and specific loss of his

support as a caretaker.  But the record is devoid of any evidence that *Defendant's*

caretaking, rather than somebody else's, is essential.  This will be addressed in

subsection (iii).

> (ii)     *"The loss of caretaking or financial support substantially exceeds*
> *the harm ordinarily incident to incarceration for a similarly situated*
> *defendant. For example, the fact that the defendant's family might*
> *incur some degree of financial hardship or suffer to some extent*
> *from the absence of a parent through incarceration is not in itself*
> *sufficient as a basis for departure because such hardship or*
> *suffering is of a sort ordinarily incident to incarceration."*

This note specifically states that a child's hardship in losing a parent to

incarceration is not a sufficient basis for departure because such suffering is ordinarily

incident to incarceration.  So too for a wife, even a very sick wife, losing her husband to

incarceration.  Children who grow up with incarcerated parents bear the psychological

scars for their entire lives.[8]  The effect of Defendant's incarceration will not be as severe

---

[8] *See, e.g.*, *United States v. Aguilar*, 133 F.Supp.3d 468, 477 (E.D.N.Y. 2015)
("children with an incarcerated parent are 3 to 4 times more likely than those without
an incarcerated parent to engage in delinquent behavior, and 2.5 times more likely to
experience mental health problems.  When looking at long-term effects, children of
incarcerated parents are more likely to have substance abuse problems and to be
unemployed, and to experience poor romantic relationships, divorce, and/or separation
from their own children.").

or long-lasting.  Finally, although Defendant claims that "[c]ase law supports the departure," Motion at 17, reading the cases he cites suggests otherwise.

Defendant leads with *United States v. McClatchey*, a case where the Tenth Circuit *reversed* the district court's imposition of a mere three-level departure, because "[t]he fact that a defendant cares for a family member with a mental or physical disability is not by itself sufficient to make the circumstances 'exceptional.'" 316 F.3d 1122, 1131 (10th Cir. 2003).  McClatchey, who was also convicted of a white collar crime, was the father of a 22-year-old son with a host of severe mental problems: "attention deficit hyperactivity disorder, severe; obsessive compulsive disorder; paraphilia, not otherwise specified, a sexual disturbance; disruptive behavior disorder; mixed personality with antisocial and narcissistic and obsessive/compulsive features; and irritability." *Id.*

In the second case, *United States v. Gauvin*, the Tenth Circuit held that a three-level departure was not an abuse of discretion where the defendant was father to four young children. 173 F.3d 798, 809 (10th Cir. 1999).  To support the children in his absence, Gauvin's wife had to work two jobs, spending 16 hours outside the house each day. *Id.* at 808.  Even so, the children were "financially barely provided for, and parentally unprovided for" to the extent that the state began an investigation into whether she could keep the children. *Id.*  Gauvin's wife was even on the verge of losing her car, which would cost her jobs, and the couple had "no extended family to take custody of the children or assist financially." *Id.*  The district court judge started she had "never seen a combination of these factors" and granted the three-level departure. *Id.*

In the third case, *United States v. Roselli*, the First Circuit affirmed a three-level departure for a defendant with four children under ten years old. 366 F.3d 58, 67 (1st

Cir. 2004).  The nine-year-old child had cystic fibrosis and the one-year-old child had cystic fibrosis and gastroesophageal reflux disease, which required two people to feed him at a time.  *Id.* at 69.  Roselli was married, but his wife could not take care of the children herself because she had fibromyalgia, chronic migraine headaches, depression, and anxiety.  *Id.* at 69-70.  The court even made findings about why specific relatives, including defendant's mother, mother-in-law, and sister, the only relatives in the state, were not able to care for the four children either.  *Id.* at 70.  The record was further supported by numerous letters from doctors, nurses, and a social worker.  *Id.*

That is, the first three cases cited by Defendant serve only to suggest that he is not even entitled to a three-level departure, as applied in *McClatchey*, *Gauvin*, and *Roselli*, let alone the 18-level departure requested by Probation.[9, 10]

_____

[9] Neither Probation nor Defendant requested a specific number of offense levels in their requests for departure.  But Probation calculated the Offense Level at 28, resulting in a Guidelines range of 78-97 months.  Its six-month recommendation results in a Total Offense Level of no higher than 10, which is what the properly calculated Guidelines would be if the tax loss in this case were under $6,500.

[10] With one exception, Defendant's remaining cases are accurately summarized in his parentheticals.  However, after citing *United States v. Gaskill*, 991 F.2d 82, 85-86 (3d. Cir. 1993) as the "most closely analogous," he misstates the case, claiming the court "sustained the sentencing judge's decision to depart to a sentence of probation." Defendant's Motion at 18.  In fact, the trial judge in *Gaskill* sentenced Gaskill to prison after believing he had no discretion to depart.  The Third Circuit merely informed the judge he did have such discretion and remanded for resentencing.

> (iii)    *"The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family."*

Defendant's caregiving is not irreplaceable.  It is not even clear that he is the ideal caretaker.  Probation notes that "[h]is current alcohol and marijuana use are cause for concern."  PSR at R-4.  Indeed, although he told Probation that he does not believe he has an alcohol problem, PSR ¶ 91, the 2013-2017 analysis of his bank accounts reveal that he spent, on average, over $1,500 per year at liquor stores.  *See* Exhibit 1.  Of greater or equal concern was the incident that led to his arrest in this case.  The information in the following paragraph is from the Park County Sheriff's Office Report, Exhibit 2, and casts doubt on whether Defendant's care is "irreplaceable."

On September 6, 2018, Mrs. Birk ran from her home, screaming "help me" over and over again.  Defendant called his neighbor, Nord, to intercept her.  Mrs. Birk ran into Nord's arms and he brought her inside.  Nord and his wife tried to calm Mrs. Birk down, but she was crying, saying "I never want to see him again," "I've never been treated this way," and "he says I'm stupid."  Nord called Defendant back and they agreed Defendant would call some people from his church to help.  Mrs. Birk told Nord that Defendant hit her and Nord called 911.  The responding officers found Mrs. Birk with a "bruise on the side of her head near her eye, and a small mark on the bridge of her nose."  The police interviewed Defendant but did not make a probable cause determination as to whether he caused his wife's injury.  They arrested him on the warrant issued in this case.

An able-bodied husband is a natural caregiver for a sick wife.  But Defendant's care is not irreplaceable.  The PSR notes, at R-4, that "[i]f the defendant is removed from the home, his wife would have to rely on the defendant's mother who resides in Virginia."  That may be one option, but Mrs. Birk has other family besides her mother-in-law.  Her father, Tony, who is 95 years old, is probably not a suitable caretaker, but her sister, Carol, and her husband live in nearby Colorado Springs.  Her brother, Kent, lives in Kansas.  Tony, Carol, and Kent all wrote letters to the Court, but none explained why Defendant is the only person who is able to care for his wife.

Although most people would prefer the comfort of family, not everyone is so lucky.  If Mrs. Birk's brother and sister (and other unidentified family members) will not take care of her, she could spend her remaining years in a memory care facility, like many others with her condition.  The United States was unable to interview Mrs. Birk's medical providers but, according to Defendant's ex-wife, who saw Mrs. Birk six months ago and is familiar with her condition from her work as a nurse, Mrs. Birk's health will likely deteriorate rapidly and require an entire team of caretakers.  *See* Exhibit 3, ¶ 11.

There are many options for memory care in the Colorado Springs area.  *See id.* ¶¶ 13-15, Exhibit 4.  It also appears that Medicare will pay for it if Defendant cannot afford to do so himself.  *See* Exhibit 3, ¶ 14.  Defendant's refusal to make (or disclose) a care plan for his wife after his incarceration should not be used as a reason to reduce his sentence.

> (iv)    *"The departure effectively will address the loss of caretaking or financial support."*

Defendant is correct that only an extreme departure to no imprisonment at all will prevent Mrs. Birk from losing Defendant's caretaking.  But there are other options for Mrs. Birk, as discussed above.  Without even informing the Court who took care of Mrs. Birk while Defendant was in custody for over three days, or when he was at job sites before his retirement, or in court in Denver for his one-week trial,[11] he asserts the he is the only available caretaker.  Families step up to care for each other during challenging times.  If Mrs. Birk's brother and sister will not help care for her, a residential memory care facility might be the only option, and it might even be the best one.

The Court should not base its sentence on Mrs. Birk's condition, either through a departure or variance.  Defendant cannot use his wife's health as a shield to escape accountability for his 20-year tax evasion.

## II.    OTHER SENTENCING FACTORS

In determining the appropriate sentence, the Court "shall consider" a) the nature and circumstances of the offense, b) the history and characteristics of Defendant, c) the need to reflect the seriousness of the offense and promote respect for the law, d) the need to afford adequate deterrence to criminal conduct, and e) the need to avoid unwarranted sentence disparities, *inter alia*.  *See* 18 U.S.C. § 3553(a).  The United States recommends a 60-month sentence and highlights the following in support.

---

[11] The government's investigation revealed that Defendant's friends from church, Dave and Diana, who were called to the scene when he was arrested, took care of Mrs. Birk while he was incarcerated and during a number of weeks when Defendant was working.

## A.  The Nature and Circumstances of the Offense

Many crimes result from a brief but consequential lack of judgment, but defendant's two decades of tax defiance and evasion cannot be characterized as a crime of opportunity or action taken for self-preservation.[12]  Defendant acknowledged knowing his country relies on tax revenue, Transcript at 6:17-25, but he was determined to avoid paying it himself.  Defendant's history of tax defiance is closely associated with his switch from working as an employee, where taxes were withheld from his wages, to going into his own business, where he would have control over what information to report to the IRS.  Defendant did more than just fail to report his own income information—he also did his best to ensure third parties would not report his income to the IRS.  The TAMI fraud revealed his sophisticated understanding of his retirement custodians' reporting and withholding requirements vis-à-vis the IRS.  In completing the fraud, he was able to gain access to over $400,000 of income without the IRS noticing, and without paying any tax.  That was the money he used to start his business—a business that, competing against builders who likely paid their taxes, provided Defendant and Mrs. Birk untaxed income, sustaining their lifestyle for nearly 20 years.

After years of not filing returns or paying taxes, the IRS engaged the Defendant, who chose not to participate in his audit.  This led to the summons of his bank records and Revenue Agent Applegate's discovery of the TAMI Fraud, contributing to large

---

[12] That Defendant's Motion, at 12, describes his conduct as "atypical" is perplexing.

assessments.  In response, Defendant went on the offensive, filing false claims for over $70,000 in August of 2005.  Specifically, Defendant late-filed Forms 1040 for 1998 and 1999 that claimed he received no wages in those years.[13]  These claims were denied in August 2006, the same month he told Dale Erickson that TAMI was just a "personal service corporation" to move money around.  Trial Exhibit 93.

Defendant's Motion claims "he is not a hardened anti-government type" but, beyond his deception and typical tax defiance, the Defendant took his conduct to a threatening level, making violent anti-government references to IRS officials and even his congressman.  *See, e.g.*, Trial Exhibit 51.  This was the conduct "[o]f greatest concern" to Probation, which otherwise wrote off Defendant's twenty-year tax evasion as simply a crime "motivated by a personal philosophical disagreement with the tax laws of the United States."  PSR at R-3.  Although dressed up to be something of principle, Defendant's desire to avoid paying taxes was motivated by nothing more noble than greed.  He is happy to take government money, either directly or through his former employers in the defense industry.  He just refuses to be a sucker that pays his way.

---

[13] The 1998 return was admitted as Trial Exhibit 1.  The 1999 return is unavailable, but is referenced in Trial Exhibit 76.

### B.  The History and Characteristics of the Defendant

#### i.    History

Defendant is fortunate to have had a better upbringing than most defendants

sentenced in the federal courts.  The son of an Army Colonel and West Point graduate,

Defendant was raised in a disciplined military family, and grew up all over the United

States, Germany, and the Philippines.  PSR ¶¶ 76, 79.  After being drafted in 1973,

Defendant decided to enlist in the Army "to have more control over his military service."

PSR ¶ 79.  He was discharged in 1975, went to college and "pursued a commission as

a pilot in the Marine Corps."  PSR ¶ 81.[14]

Defendant graduated from college and went on to earn two Master's Degrees.

PSR ¶ 97.  He "spent 22 years traveling around the country, working for many brand-

name defense contractors," and served clients that included the "Department of

Defense, Air Force, [and] Space Command."  Transcript at 3:17-19, 92:20-21.

Ultimately, he moved to Colorado and began Tarryall River Log Homes.  PSR ¶ 101.

The letters Defendant submitted present him as an intelligent, educated, likeable,

charismatic, capable, and musically talented person, which should not come as a great

surprise given his privileged upbringing.  Unfortunately, it appears this privilege has

---

[14] Defendant's Motion describes him as a "Marine veteran," but it appears that
Defendant did not receive a commission, limiting his military service to the two years in
the Army.  Defendant's Army service is to his credit, but it is too far in time to affect the
outcome of this case—back in the days when he honored his duties as a citizen by
paying taxes on income and joining the military when drafted.

contaminated Probation's recommendation.  Probation notes Defendant's four post-secondary degrees, tax compliance prior to 1998, and steady employment history as mitigating factors.[15]  They are not.  They are reasons he should have known better.

> It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir.1999).  Whether in the form of education, aptitude, or family money,[16] by virtue of good luck, Defendant's upbringing provided him with more opportunity than the average defendant sentenced in the federal courts.  The advantages that helped Defendant throughout his entire life should not give him a leg up at sentencing over those born into less fortunate circumstances.

> *ii.*     *Character*

The Court should also be skeptical of Defendant's claims of his good character.  Warm letters from friends, family, and colleagues may be honest and heartfelt, but they

---

[15] Probation even seemed impressed that Defendant could juggle running a business and committing tax evasion, nothing "[e]ven while evading taxes since 1998, the defendant successfully operated a log home business."  PSR at R-4.  Earning income is, of course, a prerequisite to tax evasion.  Every tax evader manages to earn money while cheating his country.

[16] Defendant testified "I am truly blessed to have some very deep pockets in the family, on both my wife's side and mine.  There will be some inheritance kinds of transactions at some day in the future, should I love long enough to enjoy that."  Transcript at 86:21-25.  In the meantime, he testified he receives annual gifts of "[w]hatever the gift threshold is.  I think it's $14,000 now" from both his mother and Mrs. Birk's father.  *Id.* at 87:5-7.  Defendant's brother also sent Defendant money in the past.  *See* Exhibit 3, ¶ 7.

are not atypical in white-collar cases.  Courts should "view such evidence with the skepticism of experience," *McClatchey*, 316 F.3d at 1135, and they often do.  *See*, *e.g.*, *United States v. Deason*, 622 F. App'x 350, 358 (5th Cir. 2015) (upholding refusal to vary based upon, *inter alia*, "letters of support submitted by his friends and family"); *United States v. Della Rose*, 435 F.3d 735, 738 (7th Cir. 2006) (supportive letters "by no means out of the ordinary" because privileged white-collar offenders "often have impressive records of civic and philanthropic achievement"); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) ("record of good works is neither exceptional nor out of the ordinary for someone of his income and preeminence"); *United States v. Kohlbach*, 38 F.3d 832, 837-39 (6th Cir. 1994) (not unusual for white-collar offender to have been leader in community charities, civic organizations, church efforts, and have performed prior good works); *United States v. Gilmore*, 2012 WL 1377625, at *7 (W.D. La. Apr. 18, 2012) (noting defendant "has done good works in the community, but so have many others who have appeared before this Court, particularly those charged with white-collar crimes); *United States v. Barbera*, 2005 WL 2709112, at *13 (S.D.N.Y. Oct. 21, 2005) ("high regard in which he is evidently held by the colleagues and friends who have written letters on his behalf does not distinguish him from other white-collar criminals").  Besides, Defendant's submission include some glaring omissions.

Defendant's Motion claims he has "led an exemplary life" and "raised a loving family."  Apart from the crime, he says, he is an "otherwise honest and law-abiding man."  It turns out that Defendant has been estranged from his children since leaving them and his ex-wife for Mrs. Birk.  *See* Exhibit 3, ¶¶ 2, 3, 5.  Defendant met Mrs. Birk, a colleague in the defense contracting industry, while he was still married, and they

engaged in a long extra-marital affair.[17]  *Id.*  At some point, he moved with his ex-wife

and their two children from Virginia to Michigan.  *Id.* at ¶ 2.  A few months later, he

abandoned his family (including his children, ages 7 and 11) to be with Mrs. Birk, who

had since moved to Colorado.  *Id.*  Defendant's son describes him as a negligent father

who repeatedly cheated on his mother for years.  *Id.* at ¶ 3.  He also remembers

hearing Defendant tell him about the IRS agents that came to his house, bragging that

he told the Sheriff he would shoot any IRS people who came onto his property.  This is

likely a reference to the incident in 2012, which was briefly recounted by Revenue

Officer Jennifer Morgan at trial.[18]  Defendant's son further told Agent Warnock that

Defendant tried to talk about taxes with anyone who would listen, and views his

conviction as "karma" for the father he describes as a "selfish" person.  *Id.*[19]

Defendant's desire to share his views on taxes and the IRS was so strong that he used

the email address taxpatriot@gmail.com.  *See* Exhibit 11.  Also, when Revenue Officer

---

[17] *Compare* PSR ¶ 82 (defendant told Probation his ex-wife "wore him down," and he described his divorce by saying they "decided we [they] didn't really like each other.").

[18]   On April 3, 2012, Revenue Officer Morgan sought the protection of an armed escort for her planned attempt to serve Defendant with papers related to the seizure of vacant land he owned.  Such service was effected on April 27.  On May 2, she received a call from the Park County Sheriff, in which the Sheriff relayed Defendant's complaint about RO Morgan coming to his property with an armed escort.  *See* Exhibit 5.

[19] Defendant's daughter, who Defendant testified is a Charlottesville police officer, was also contacted.  She noted their estrangement, but did not wish to speak further to Special Agent Warnock, telling him only that she had nothing to say to the judge before sentencing.  Defendant's estrangement from his children is to the extreme extent that, aware of his sentencing, they did not offer letters of support.  This is more of a testament to his character than the letters from his church friends.

Morgan showed up at his gated community and was let in by the HOA President, he knew without her having to say that she was there to see Defendant.  *See* Exhibit 5.

Defendant started Tarryall shortly after moving to Colorado, leaving his wife and young children back in Michigan.  Since then, he has not voluntarily paid a dollar of tax.  At the same time, his lifestyle has been sustained by his business, his (mostly Mrs. Birk's) retirement savings, Social Security, and money from family.  His retirement plan includes relying on inheritance from his and Mrs. Birk's family.  Transcript at 86:21-25.  Although his letter writers praise his care of his sick wife—a baseline obligation of marriage—they ignore Defendant's substantial, non-altruistic motivation for taking care of Mrs. Birk: remaining in the good graces of her family and ensuring she out-lives her father.  Although he testified that both his and Mrs. Birk's family have "some very deep pockets in the family, on both my wife's side and mine," *id.*, his brother is unaware of any significant inheritance he or Defendant might get when their mother passes.  *See* Exhibit 3, ¶ 7.  But Mrs. Birk's family is planning for significant inheritance when Mrs. Birk's 95-year-old father dies.  *Id.* at ¶ 8.  If Mrs. Birk passes before her father, Defendant might be shut out from any inheritance from her family, putting his retirement plan on the line.  In the meantime, he receives Mrs. Birk's Social Security payments, as he testified that he is waiting to draw on his own until he is 70—a bold statement for a man who has not paid into Social Security since 1998.  Transcript at 86:21-25.

Defendant is a financial drain on both his country and his family.  At the very least, the Court should not afford Defendant a downward variance based on his character, which is not so stellar that it separates him from the average white collar

offender, let alone the average drug dealer who abandoned his children after cheating

on their mother.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

Imagine a hardworking taxpayer who learns about the facts of this case: a highly

educated businessman has successfully avoided paying his taxes for over two decades.

The man says he will not pay because he questions the legality of the tax system.  The

IRS told him numerous times that his legal positions are frivolous, but the man still

refuses to pay because, as he puts it, his "servant government" will not answer his

questions with particularized specificity.[20]  Despite an immense expenditure of

government resources to collect on his tax liabilities, the man has not even sent a dollar

to the IRS, sending threatening correspondence instead.  He was indicted, but did not

show in court and had to be arrested.  He was provided with two capable defense

attorneys and a paralegal, all paid at the government's expense.  He went to trial, where

he confronted the witnesses against him (including many of the dozens of IRS

employees who engaged him over the years) and testified in his defense before a jury

of his peers.  The jury promptly found him guilty.

Nevertheless, he asks the Court to let him get away with it all.  Anything less than

a severe prison sentence would make Defendant a poster child for what is wrong with

---

[20] He even agreed with his attorney's characterization that receiving a form letter, instead of correspondence that addressed each of his arguments with particularity, was "like a big F-U."  Transcript at 32:22-24.

our voluntary tax system.  Following Probation's view that he is entitled to leniency because of his education, and history as someone who used to work and pay taxes, would make him a poster child for what is wrong with our justice system as well. Probation or home detention would hardly be punishment at all for a retiree who must stay home anyway to care for his wife anyway.

Tax evasion is a serious crime.  To quote the "Letter 3175" sent to Defendant in 2001, "[w]hile tax collection is not a popular function of government, it clearly is a necessary one.  Without it all other functions would eventually cease."  Trial Exhibit 20. While millions of Americans voluntarily pay their taxes every year, Defendant opted for the free ride.  Paying taxes is neither convenient nor painless.  Many taxpayers live under economic stress far graver than Defendant.  Many have to provide for themselves and others without two Master's Degrees or the assistance of a wealthy family, but they pay their taxes anyway.  The sums paid, often a meaningful portion of a taxpayer's income and a significant amount to part with, are just a drop in the bucket compared to Defendant's outstanding bill after twenty years of tax defiance.

A sentence the public perceives as a slap on the wrist will fail to reflect the seriousness of this offense or promote respect for the law.

### D.  The Need for the Sentence Imposed to Afford Adequate Deterrence

#### i.  *Specific deterrence*

Defendant's Motion, at 12, claims he is "chastened by this experience," and will never commit this offense again.  This is hard to square with the fact that Defendant has still yet to file any back returns or make any payments.

*ii.    General deterrence*

After dedicating two full pages to the uncontroversial proposition that older defendants with zero criminal history points are unlikely to reoffend, Defendant's Motion, at 14, says "[n]or is general deterrence a significant concern in this unique case."  That could not be further from the truth.  First, general deterrence is the most important factor in all tax cases, and particularly in tax defier cases.  Second, nothing is unique about this case.

Deterrence is of paramount importance for white-collar offenses.  "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'  Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting in part Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)); *see also United States v. Hayes*, 62 F.3d 1300, 1308 (11th Cir. 2012) ("general deterrence is an important factor in white-collar cases, where the motivation is greed").

This is especially true of criminal tax cases, which are relatively rare.  "Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines."  USSG ch. 2, pt. T, introductory cmt.; *see also United States v. Burgos*, 276 F.3d 1284, 1289, n.6 (11th Cir. 2001) ("For a judge sentencing a defendant convicted of tax evasion, the chief concern may be general deterrence.").

This is especially true today.  In recent months, the media has widely reported how the diminished resources of the IRS allow many tax cheats to go undetected for years. *See, e.g.*, Exhibit 6, The Editorial Board, *The Taxman Is (Not) Coming After You*, N.Y. TIMES, March 28, 2019, ("New investigations of [non-filers] fell from 2.4 million in 2011 to just 362,000 in 2017.").  Considering the relatively low number of criminal tax prosecutions undertaken every year, it is important to send a message that deters would-be tax cheats and assures honest taxpayers that tax criminals are being held accountable.  As the Eighth Circuit eloquently noted in vacating a non-prison sentence in a $250,000 tax evasion case, "the goal of deterrence rings hollow if a prison sentence is not imposed in this case."  *United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006).

Our tax system requires the participation of all taxpayers.  Encouraging voluntary compliance is especially important among small business owners, like Defendant. Many individuals have their taxes withheld by their employer and are thus not faced with the choice of whether to voluntarily pay their federal income taxes.  For those fortunate enough to own their business, often the richest among us, the incentive to fall out of voluntary compliance can be weighty.  To ensure compliance, the IRS uses the twin measures of civil audit and criminal prosecution.  As the percentage of audits has fallen, the need to promote voluntary compliance through criminal prosecution has risen.  *See* Exhibits 7-8, Paul Kiel and Jesse Eisinger, *How The IRS Was Gutted*, ProPublica, Dec. 11, 2018 (noting a 42% decline in audits between 2010 and 2017), *After Budget Cuts, the IRS' Work Against Tax Cheats Is Facing 'Collapse'*, ProPublica, Oct. 1, 2018 (reporting that the IRS conducts only one criminal case per 3,600 audits).

Defendant is also wrong when he says this case is unique.  In fact, it is nearly identical to another tax defier case undersigned counsel tried just four months earlier in Las Vegas, *United States v. Waller*, 18-CR-112.  Like Defendant, Waller also testified that he keeps apprised of other criminal tax cases.  Just as Defendant said "[t]he ones that I spent the most time on were the acquittals," Transcript at 124:10, Waller similarly focused on acquittals, offering the jury a list of "victories" that included "Joe Banister," whom Defendant mentioned as well.  Exhibit 9 at 3-4.[21]

The sentence in this case should send the message that even the low chance of detection is not worth the risk.  If twenty years of tax defiance leads to anything less than a severe prison sentence, it would only serve to encourage tax evasion.  The sentence should not only serve to reassure the taxpaying public that they are not suckers, but also give pause to tax defiers who are watching, and awaiting, the outcome in this case.  In sentencing Defendant to an enhanced sentence for committing perjury in his failed attempt to abuse the "good faith" defense, the Court's sentence will deter tax defiers from making similar attempts.  Should the Court doubt the attention of other tax defiers, consider that Waller's trial was attended by the "President" of "Freedom Law School," an outfit that hosts podcasts and sells defier materials, including a "mock court" tutorial that teaches people how to present a willfulness defense at trial.  Unfortunately,

---

[21] Waller also mentioned being influenced by Bob Schulz, the founder of We The People, the organization to which Defendant belonged.  *Id.* at 1.  Like Defendant, Waller also was confronted by a government who told him his arguments were frivolous.  *Id.* Waller also mounted a similar "good faith" defense based on his own research, rather than legal or accounting authorities.  *Id.* at 2.  Also similar to Defendant, Waller testified that he would be happy to pay if only someone would explain the law to him.  *Id.*

it seems the "fear" that the Court's holding in *Cheek v. United States* would "encourage taxpayers to cling to frivolous views of the law in the hope of convincing a jury of their sincerity," 498 U.S. 192, 210 (1991) (Blackmun, J., dissenting), has proved prophetic.

**E. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

On October 11, 2019, Waller was sentenced to a term of 78 months' imprisonment, based on the same Guideline calculation determined in this case: tax loss of greater than $3.5M, sophisticated means, and obstruction of justice.[22]  Like Defendant, he was a tax defier who stopped filing returns in 1998.  Like Defendant, his filing was correlated with his move from being a W-2 wage earner (with taxes automatically withheld from his paycheck) to a sole proprietor.  Like Defendant, he used his business bank account, even for his personal affairs, to shield his assets from IRS levy.  Like Defendant, he took the stand, citing the influence of famous tax defiers (but also focusing on his own "research") to support his alleged "good faith" belief that there is no law requiring him to pay tax.  It should be no surprise for the Court to hear that what Defendant describes as his "unorthodox tax beliefs" are just the hackneyed lines used by greedy tax defiers throughout the country.  After all, Defendant put himself on a lawsuit with over one thousand other tax defiers nation-wide.

---

[22] In addition to tax evasion, Waller was also convicted of two counts of failure to file. With two additional misdemeanor counts of conviction, Waller's statutory maximum was 84 months—two years higher than Defendant's.

Although undersigned counsel is less familiar with the facts of these other cases, it appears sentences like Waller's are not an uncommon sight for tax defiers in the District of Colorado.  Judge Arguello sentenced Timothy Stubbs, discussed *supra* at pp. 3-4, to 88 months' imprisonment.  She also sentenced Michael Williams, another non-filer, to 71 months following his 2013 trial.  *See* 12-cr-140.  In 2012, Your Honor sentenced Richard Armstrong and his co-defendant Curtis Morris to 108 and 120 months after they were found guilty of filing false tax returns, seeking large refunds based on bogus Forms 1099-OID.  *See* 10-cr-317.  Although Armstrong and Morris succeeded, obtaining over $1.6 million in fraudulent refunds, their scheme was not much different from Defendant's filing of false 1998 and 1999 returns, seeking over $70,000 in refunds based on bogus Form W-2 substitutes.

### III.    DEFENDANT'S POLICY ARGUMENTS SHOULD BE AFFORDED NO WEIGHT

Defendant cites no case in support of his four-page argument that "The Guidelines are Flawed and Deserve Little Weight."  On the contrary, the Guidelines are important for ensuring that the federal courts impose similar sentences for similar crimes, and miscalculating them is reversible error.  In addition, concern that "white-collar offenders" received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the Sentencing Guidelines. S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3260.  To the extent the Guidelines increased the average white collar sentence, it was to resolve "significant disparities" observed in data gathered by the Commission on how white-collar crimes were treated at sentencing relative to equally serious non-white-collar offenses in the pre-Guideline

era. *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 HOFSTRA L. REV. 1, 20 (1988).

**IV.** **RESTITUTION**

The United States requests that the Court order restitution as a special condition of supervised release.  Courts are authorized to order restitution as a condition of supervised release pursuant to 18 U.S.C. § 3583(d).  Restitution should be ordered as a condition of supervised release to ensure Defendant complies with his tax obligations. Generally, the amount of restitution is limited to losses caused by the specific conduct underlying the offense of conviction (not including relevant conduct), plus prejudgment interest.  Defendant should be ordered to make restitution to the IRS of $1,858,826.26, which includes taxes and interest for the years of conviction as follows.

| Year | Tax | Interest | Total |
|------|-----|----------|-------|
| 1998 | $18,173.00 | $33,568.33 | $51,741.33 |
| 1999 | $10,184.00 | $16,891.85 | $27,075.85 |
| 2000 | $204,398.30 | $292,553.01 | $496,951.31 |
| 2001 | $279,037.00 | $354,024.11 | $633,061.11 |
| 2002 | $235,554.00 | $269,186.32 | $504,740.32 |
| 2003 | $64,292.00 | $67,398.16 | $131,690.16 |
| 2004 | $6,023.00 | $5,738.23 | $11,761.23 |
| 2005 | $993.00 | $811.95 | $1,804.95 |
| | **$818,654.30** | **$1,040,171.96** | **$1,858,826.26** |

The United States requests that the above table be included in the judgment.  To further assist the clerk of court in processing restitution payments, the IRS's address for collection of restitution payments should also be included in the judgment:

IRS - RACS
Mail Stop 6261, Restitution
333 W. Pershing Ave.
Kansas City, MO 64108

Further, if the Court orders Defendant to pay restitution to the IRS, either as part of the sentence or as a condition of supervised release or probation, the IRS will use the restitution order as the basis for a civil assessment.  *See* 26 U.S.C. § 6201(a)(4). Defendant does not have the right to challenge the amount of any restitution-based assessment.  *See* 26 U.S.C. § 6201(a)(4)(C).  Neither the existence of a restitution payment schedule, nor Defendant's timely payment of restitution according to that schedule, will preclude the IRS from immediately collecting the full amount of any restitution-based assessment, including by levy and destraint under 26 U.S.C. § 6331. Interest on any restitution-based assessment will accrue under 26 U.S.C. §§ 6601 and 6621 from the last date prescribed for payment of the liability that is the subject of the restitution order to the date that the IRS receives payment.

## V.   COSTS OF PROSECUTION

The United States recommends the Court order Defendant to pay costs of prosecution.  Under USSG § 5E1.5, costs of prosecution shall be imposed as required by statute.  Tax evasion, 26 U.S.C. § 7201 requires the imposition of costs, and 28 U.S.C. § 1918(b) allows the imposition of costs "whenever any conviction for any offense not capital is obtained."  The costs of prosecution that may be assessed are set

forth in 28 U.S.C. § 1920, and include fees for transcripts necessarily obtained for use in the case, as well as fees and disbursements for witnesses.  In this case, the total, recoverable costs of prosecution are at least $9,356.22,[23] *see* Exhibit 10, and they should be taxed to Defendant.

**VI.   CONCLUSION**

Defendant's twenty years of defiance and multi-million dollar tax evasion is egregious.  A Guidelines sentence is necessary to punish him and deter others from cheating our country and its law-abiding taxpayers.  Letting him get away with it because of Mrs. Birk's condition will only send the message that such conduct is acceptable so long as it is committed by a privileged defendant whose family will suffer as a result of incarceration (as if the families of poorer defendants do not suffer).

The United States recommends that the Court sentence Defendant to a term of 60 months in prison, followed by three years of supervised release with a condition to pay restitution in the amount of $1,858,826.26.

---

[23] This figure does not include the recoverable costs of transcribing grand jury transcripts, or travel costs for witnesses who were still employed by the IRS.

Respectfully submitted this 23rd day of October, 2019.


RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

By: /s/ *Christopher Magnani*

ELIZABETH C. HADDEN
Assistant Chief
CHRISTOPHER MAGNANI
Trial Attorney
U.S. Department of Justice, Tax Division
150 M Street, NE
Washington, DC 20002
Tel: (202) 514-5189
Fax: (202) 514-9623
elizabeth.c.hadden@usdoj.gov
christopher.magnani@usdoj.gov


Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 23, 2019 I electronically filed the foregoing with the clerk of court by using the CM/ECF system which will send a notice of electronic filing to the attorneys of record.

<u>*/s/ Christopher Magnani*</u>
Christopher Magnani
Trial Attorney
U.S. Department of Justice, Tax Division
150 M Street NE
Washington, DC 20002
Tel: (202) 307-6408
Fax: (202) 514-9623
Email: christopher.magnani@usdoj.gov